BROTHERHOOD OF LOCOMOTIVE ENGINEERS, Plaintiff-Appellant,

v.

The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, and United Transportation Union, Defendants-Appellees.

No. 84–3177.

United States Court of Appeals, Seventh Circuit.

Argued May 30, 1985.

Decided July 26, 1985.

Harold A. Ross, Ross & Kraushaar Co., L.P.A., Cleveland, Ohio, for plaintiff-appellant.

John J. Naughton, Henslee Monek & Henslee, Chicago, Ill., for defendants-appellees.

Before WOOD and POSNER, Circuit Judges, and WEIGEL, Senior District Judge.*

POSNER, Circuit Judge.

The Brotherhood of Locomotive Engineers sued the Atchison, Topeka and Santa Fe Railway, lost, and appeals, presenting us with interesting questions under the Railway Labor Act.

In the glory days of the railroads, generally a worker became a locomotive engineer by promotion from the ranks of the firemen after having been a fireman for at least three years, and his seniority as an engineer dated from the promotion, not from when he had become a fireman. His seniority as a fireman, of course, dated from when he had become a fireman, and this was sometimes important, because in slack periods an engineer might be demoted to fireman, and whether there was a job for him as a fireman might depend on how much seniority he had as a fireman. When an engineer was hired either from another railroad or from another seniority district of the same railroad, where (in either case) he had been an engineer, his seniority as an engineer with the new railroad or in the

* Hon. Stanley A. Weigel of the Northern District of California, sitting by designation.

new district was based on his first service as an engineer. Thus he lost none of his seniority as an engineer because of the change of employer or district.

All this was spelled out, so far as the Santa Fe was concerned, in Article XIX of its collective bargaining agreement with the engineers' union, a provision that goes back to 1919 or earlier but is in the current agreement. Until 1972 the Santa Fe's collective bargaining agreement with the firemen's union, the United Transportation Union, had an identical provision. A fireman or engineer can join either union. See 45 U.S.C. § 152 Eleventh (c).

With the replacement of steam locomotives by diesels, firemen became superfluous, and their retention in the cabs of diesel locomotives was a prime example of the featherbedding that plagued the railroad industry for so many years; for general background see Leiter, Featherbedding and Job Security 70–100 (1964). Congress established a special arbitration board to resolve the problem of supernumerary firemen, see Pub.L. 88–108, Aug. 28, 1963, 77 Stat. 132, and the board authorized the railroads to eliminate firemen from about 90 percent of all freight crews. As a result of this award and subsequent negotiations, firemen today are essentially just apprentice engineers. The new status of firemen was defined in an agreement that the railroads, including the Santa Fe, made with the firemen's union in 1972. This is the UTU Training Agreement. Article II.A.2 of this agreement provides that "no employee, not previously qualified, shall be eligible to be promoted to the craft of locomotive engineer, without first entering the service as fireman (helper) and completing the training set forth herein." Article II.E provides that "if a junior fireman (helper) is promoted out of turn, such junior fireman (helper) will rank below any senior fireman (helper) as an engineer, when such senior fireman (helper) completes the program and is given a certificate as an engineer, unless agreements on an individual Carrier provide otherwise."

An unanticipated consequence of the reduction in the number of firemen was a shortage of firemen to promote to engineers. By 1977, engineers on the Santa Fe were complaining that they were working too hard. The Santa Fe responded by hiring from other railroads, or transferring from its other seniority districts, a number of engineers whom it initially designated as firemen and then after a few weeks or months of training redesignated as engineers. It gave them seniority as engineers from the date of the redesignation, not the date of their first service as engineers. A short time later the railroad promoted some firemen to engineer but gave them seniority as engineers as of the date they had been hired as firemen. This put them ahead of the "hired" engineers (meaning hired from previous jobs as engineers, rather than promoted from fireman) on the seniority roster, since on average the promoted firemen had been working as firemen (i.e., apprentice engineers) for 15 to 18 months before their promotion. The Santa Fe did this in purported reliance on the provisions of the UTU Training Agreement quoted earlier. Article II.A.2 it interpreted as requiring it to hire "hired engineers" as firemen, and Article II.E as requiring it to place them in the seniority roster below more senior firemen as soon as the latter became engineers. The engineers' union argued, however, that this practice violated Article XIX of its agreement with the Santa Fe, which the engineers' union considers one of the agreements referred to in Article II.E of the UTU Training Agreement, and which as mentioned makes the seniority date of a "hired engineer" the date of his first service as an engineer. Although the Santa Fe's practice of treating hired engineers as firemen and putting them below subsequently promoted but more senior firemen first became controversial in 1978 when the Santa Fe did a lot of hiring, apparently the railroad had been following the practice since at least 1973, the year after the signing of the UTU Training Agreement.

The railroad and the engineers' union are also at loggerheads over whether a fireman

who passes his examination for promotion to engineer before a more senior fireman does, because the latter, though entitled by his seniority to be examined first, flunks the exam and has to take it over, should nevertheless be put behind the more senior fireman on the seniority roster when the latter finally passes the exam and becomes an engineer. The firemen and Santa Fe say "yes," relying on Article II.E of the training agreement, which requires that the seniority of firemen be preserved when they become engineers. The engineers' union says "no," relying again on Article XIX of its agreement, which makes an engineer's seniority as engineer depend on when he first became an engineer, not when he first became a fireman.

The engineers' union filed a grievance against the Santa Fe, alleging that the railroad was violating Article XIX. The grievance eventually was referred to a panel of arbitrators, called a "Public Law Board." This is an optional method, see section 7 First of the Railway Labor Act, 45 U.S.C. § 157 First; 10 Kheel, Labor Law § 50.06[1], at pp. 50–37 to 50–38 (1985), for resolving what are called in the trade "minor disputes," defined as "disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. § 153 First (i). The firemen's union intervened in the arbitration. The issue put to the panel was as follows: "Under the provisions of Article 19 of the BLE Agreement, is the Carrier properly establishing the seniority of engineers upon their promotion?" Without answering this question directly, the panel, over the dissent of the member representing the engineers' union, rejected the grievance. It said, "Since firemen (helpers) are no longer a viable craft entity, the purpose and reason for Article 19 do not exist. Today firemen, with rare exceptions, are apprentice engineers. The question then as to which engine service organization would supply, train and promote apprentice engineers was definitively answered in July

1972, with the execution of the UTU [Training Agreement].... BLE Article 19 became obsolete.... Since July 1972 the Carrier has only hired or transferred employees as firemen, and thereafter their devolution into engineers has been governed by the 1972 [agreement]." The panel found "substantial evidence in the record to show that the BLE accepted and operated under the terms of the 1972 [agreement] for several years."

The engineers' union then brought this suit, for both damages and injunctive relief, against the Santa Fe; later the firemen's union became a defendant also. Count I of the complaint bases federal jurisdiction on 28 U.S.C. §§ 1331 and 1337, and seeks primarily to enjoin the Santa Fe from violating Article XIX of the engineers' agreement on the ground that by doing so the railroad is violating section 2 First of the Railway Labor Act, which imposes a duty to bargain in good faith, and section 6, which requires advance notice of any unilateral change in working conditions. 45 U.S.C. §§ 152 First, 156. Count II of the complaint bases jurisdiction on section 3 First (q) of the Act, which empowers a federal district court to set aside an arbitration award "for failure ... to comply with" the Act, "for failure of the [award] to conform, or confine itself, to matters within the scope of the [panel's] jurisdiction, or for fraud or corruption by" an arbitrator. 45 U.S.C. § 153 First (q).

All parties moved for summary judgment. The district judge dismissed Count I for lack of subject-matter jurisdiction. Regarding Count II, he decided that the arbitration panel had exceeded its jurisdiction. But rather than setting aside the arbitration award he ordered the complaint dismissed in its entirety, on the ground that the National Mediation Board had exclusive jurisdiction over the dispute between the engineers' union and the Santa Fe because it was a dispute "as to who are the representatives of such employees." 45 U.S.C. § 152 Ninth. The engineers' union has appealed.

■ While agreeing with the district judge that the complaint should be dismissed, the railroad and the firemen's union do not defend his ground for dismissing Count II, and of course do not agree with his dictum that the arbitrators exceeded their jurisdiction. Although it is true that section 2 Ninth gives the National Mediation Board exclusive jurisdiction over representation disputes, that is, disputes over which union represents which employees, see, e.g., *International Brotherhood of Teamsters v. Texas Int'l Airlines, Inc.*, 717 F.2d 157, 159 (5th Cir.1983); cf. *Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 263, 269–70, 84 S.Ct. 401, 404, 407–08, 11 L.Ed.2d 320 (1964), there is no such dispute in this case. The engineers' and firemen's unions are at loggerheads but not over the question of who represents which workers, or, more concretely, who can negotiate with the railroad regarding a specific issue. See *Brotherhood of Locomotive Firemen & Enginemen v. Seaboard Coast Line R.R.*, 413 F.2d 19, 24 (5th Cir.1969). The disagreement is over the relative seniority of different workers, and could hardly be resolved by a representation election, the method specified in section 2 Ninth for the resolution by the National Mediation Board of representation disputes. A disagreement over the conditions of employment is, indeed, a classic "minor" dispute, and the veritable avalanche of cases that hold that three-cornered work-assignment disputes (disputes between two unions, with the employer siding with one of them) are minor disputes provides powerful support for our conclusion that the dispute in this case, too, is minor. See e.g., *Transportation-Communication Employees Union v. Union Pac. R.R.*, 385 U.S. 157, 162, 87 S.Ct. 369, 372, 17 L.Ed.2d 264 (1966); *Atchison, Topeka & Santa Fe Ry. v. United Transportation Union*, 734 F.2d 317, 321 (7th Cir.1984); *Brotherhood of Locomotive Firemen & Enginemen v. Union Pac. R.R.*, 423 F.2d 673, 674 (9th Cir.1970) (per curiam), and especially *Brotherhood of Locomotive Firemen & Enginemen v. National Mediation Bd.*, 410 F.2d 1025, 1030 (D.C.Cir.1969).

■ The district judge was quite right, however, to dismiss Count I for lack of subject-matter jurisdiction. The duty that has been inferred from section 2 First of the Railway Labor Act to bargain collectively is enforceable by an injunctive action in federal district court, *Chicago & North Western Ry. v. United Transportation Union*, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971), but the Santa Fe has not refused to bargain with the engineers' union; it just has refused to comply with the union's interpretation of a collective bargaining agreement. Maybe a refusal to bargain collectively could be teased out of the Santa Fe's action in 1972 in signing an agreement with another union which in effect abrogated a portion of the railroad's agreement with the engineers' union. But we shall not have to consider the merits of this view. This suit was brought in 1982, which was too late to complain about a refusal to bargain in 1972. Although the Railway Labor Act has no statute of limitations applicable to violations of section 2 First, we shall borrow the six-month statute of limitations in section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b), for filing complaints of unfair labor practices with the National Labor Relations Board. A refusal to bargain is a classic unfair labor practice. The analogy to section 10(b) is therefore even clearer than in cases alleging breach of a union's duty to represent workers fairly; yet those cases, whether arising under the Taft-Hartley Act or the Railway Labor Act, have been held to be governed by the borrowed six-month period of section 10(b). See *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983), and with specific reference to the Railway Labor Act *United Independent Flight Officers, Inc. v. United Air Lines, Inc.*, 756 F.2d 1262, 1269–73 (7th Cir.1985).

The other allegation in Count I is that the railroad is violating section 6 of the Act; that if the dispute between the railroad and the engineers' union is not a representation dispute, then it is a "major"

dispute—but in no event is it, as we have suggested, a "minor" dispute. There is an apparent contradiction between Count II and this part of Count I. Count II complains about the arbitrators' award; Count I, in charging a violation of section 6 of the Railway Labor Act, implies that the dispute should not have been referred to arbitration, because it was a major rather than minor dispute, and the arbitral remedies established by the Act are limited to minor disputes. Having filed a grievance over the matter and thus voluntarily invoked those remedies, maybe the engineers' union should be estopped to challenge the arbitrability of the dispute. The union might reply that the arbitrators made clear that the dispute was major when they characterized the railroad's action (or so the union argues) as changing rather than interpreting a collective bargaining agreement; a dispute over a change in the agreement is, conventionally anyway, a major rather than minor dispute, as we shall see. But the Act provides specific remedies against arbitrators' overstepping the limits of their powers; it seems odd that an additional remedy should be an injunctive action to enforce section 6.

A further question is whether there is, at least in a case such as this where there is a collective bargaining agreement (actually two agreements) in force, a difference between alleging a refusal to bargain (the other allegation in Count I) and alleging a refusal to give notice of a change in the agreement. Different sections of the Act are invoked but they seem to cover the same ground, for the refusal to bargain consists in unilaterally—that is, without negotiations, without bargaining—altering the collective bargaining agreement.

■ In any event, the dispute here was minor. A minor dispute as we know is a dispute over the meaning or application of a collective bargaining agreement and is resolved by the compulsory-arbitration procedures that the Railway Labor Act establishes. A major dispute, in the canonical formulation, is a dispute over an attempt to change the collective bargaining agree-

ment, *Elgin, Joliet & Eastern Ry. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945), reaffirmed after reargument, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946), and requires advance notice under section 6, which the Santa Fe never gave. The line between interpreting and changing an agreement is often fuzzy. See, e.g., *St. Louis Southwestern Ry. v. Brotherhood of Railroad Signalmen,* 665 F.2d 987, 990–93, 998 (10th Cir.1981); cf. *Matterhorn, Inc. v. NCR Corp.,* 763 F.2d 866, 872–73 (7th Cir.1985). A refusal to follow apparently clear contractual language could be a unilateral modification of the contract, thereby generating a major dispute, or a bold and possibly erroneous interpretation of the contract, thereby generating a minor dispute.

■ Since the machinery for resolving major disputes is conciliatory rather than binding, a major dispute can escalate into a strike, which in the transportation industries—producers of a nonstorable service—can be a calamity. So it is no surprise that, when in doubt, the courts construe disputes as minor. See, e.g., *Chicago & Northwestern Transportation Co. v. United Transportation Union,* 656 F.2d 274, 277–79 (7th Cir.1981); *Brotherhood Railway Carmen v. Norfolk & Western Ry.,* 745 F.2d 370, 374–75 (6th Cir.1984); *Air Line Pilots Ass'n, Int'l v. Trans World Airlines, Inc.,* 713 F.2d 940, 947–49 (2d Cir.1983), aff'd in part and rev'd in part, on other grounds, under the name of *Trans World Airlines, Inc. v. Thurston,* — U.S. —, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). Here the Santa Fe is claiming to be acting under contractual authority. Admittedly it is authority conferred by a contract with a different union from the grievant. But this type of three-cornered dispute has, as we have seen, traditionally been treated as "minor," reflecting an understandable judicial preference for arbitration over economic warfare, provided the arbitrators are not left at large. Here they are not; they are confined to contract interpretation, albeit interpretation of two contracts rather than one. Granted, the railroad's position in

effect is that its contract with the engineers' union was modified. But since the agent of modification is another collective bargaining contract, the matter is well within the normal ken of arbitrators, and the Railway Labor Act requires arbitration of all contract disputes. Hence we need not decide whether the section 6 claim, like the section 2 First claim, is untimely—an issue complicated by the fact that the former could be thought to charge a continuing violation. See *Brunswick Corp. v. Riegel Textile Corp.,* 752 F.2d 261, 271 (7th Cir.1984); *Weber v. Consumers Digest, Inc.,* 440 F.2d 729, 731 (7th Cir.1971).

The only issue left to resolve is whether, as charged in Count I of the complaint, the arbitrators exceeded their authority when they rejected the grievance filed by the engineers' union. If so, the arbitrators' decision must be set aside; and that is the main thing (and the only possibly warranted thing) that the union asks us to do on this appeal.

■ As the language quoted earlier from section 3 First (q) indicates, the standard of judicial review of railway labor arbitration awards is extremely narrow. Perhaps "review" is a misnomer. The district court (and this court, on appeal from the district court) does not review the correctness of the arbitration award, even under a highly deferential standard, such as "clearly erroneous" or "clear abuse of discretion." All it asks, unless issues of fraud or corruption are raised, as they are not here, is whether the arbitrators did the job they were told to do—not whether they did it well, or correctly, or reasonably, but simply whether they did it. See, e.g., *Union Pac. R.R. v. Sheehan,* 439 U.S. 89, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978) (per curiam); *Skidmore v. Consolidated Rail Corp.,* 619 F.2d 157, 159 (2d Cir.1979) (per curiam). Although most of the cases deal with review of decisions of the National Railroad Adjustment Board, which is a permanent arbitral tribunal created by the Act, and although the statute does not contain a standard for judicial review of decisions of Public Law Boards, the optional mechanism of dispute resolution used in this case, courts assume the standard is the same. See, e.g., *Thomas v. Illinois Central R.R.,* 521 F.2d 208 (5th Cir.1975). This must be right. The Public Law Boards are intended to be substitutes for the chronically overworked National Railroad Adjustment Board. Both are arbitration tribunals. Probably, as we are about to see, the scope of federal judicial review of arbitration is the same, regardless of the statute; it must also be the same within the same statute. The Railway Labor Act is a somewhat underdeveloped statute; much has been left to inference—including the right to judicial review of decisions by Public Law Boards. See *United Transportation Union v. Indiana Harbor Belt R.R.,* 540 F.2d 861 (7th Cir.1976), and for general background Northrup, *The Railway Labor Act: A Critical Reappraisal,* in Collective Bargaining: Survival in the '70's? 187 (Rowan ed. 1972).

■ The question for a court reviewing a railroad arbitration decision is much the same—maybe exactly the same, though differently expressed—as when a court is asked to set aside a labor arbitrator's award in an industry subject to section 301 of the Taft-Hartley Act, 29 U.S.C. § 185, rather than the Railway Labor Act. The question is whether the arbitrator interpreted the collective bargaining agreement, as distinct from bringing in his own notions of justice to resolve the dispute. The same issue, though again differently expressed, arises in commercial arbitration. A federal court is not authorized to set aside the arbitrator's award so long as the arbitrator interpreted the parties' contract, which is what he was asked to do. See 9 U.S.C. § 10(d). On the convergence of the standards for review under the Railway Labor Act, the Taft-Hartley Act, and the United States Arbitration Act—a welcome instance of legal simplification—see *Loveless v. Eastern Air Lines, Inc.,* 681 F.2d 1272, 1276 (11th Cir.1982); cf. *Gunther v. San Diego & Arizona Eastern Ry.,* 382 U.S. 257, 263–64, 86 S.Ct. 368, 371–72, 15 L.Ed.2d 308 (1965).

■ Cases can be found where the line between a gross error by the arbitrator, which a reviewing court is not authorized to correct, and the arbitrator's exceeding the scope of his authority by doing something other than contract interpretation, which the court is authorized to correct, blurs; maybe *Wilson v. Chicago & North Western Transportation Co.*, 728 F.2d 963, 967 (7th Cir.1984), on which the engineers' union relies, is such a case. But the weight and direction of the cases are clear enough: an arbitrator's award may be overturned only if the reviewing court is convinced that he was not trying to interpret the collective bargaining contract but that instead he resolved the parties' disputes according to his private notions of justice. The test is not error; it is *ultra vires*. For a good statement see *Diamond v. Terminal Ry. Alabama State Docks*, 421 F.2d 228, 233–34 (5th Cir.1970).

■ To come under this standard, the engineers' union argues as follows: The arbitration panel was directed to decide whether the Santa Fe was violating Article XIX. It did not do that. Instead it repealed Article XIX—declared it "obsolete." In thus modifying the collective bargaining agreement, the arbitrators exceeded their authority, which is limited to interpreting the agreement. One reply that the defendants make, but a weak one, is that Article XIX only prescribes seniority for engineers hired as engineers; it leaves the railroad free to hire engineers as firemen. But even if Article XIX contains such an enormous loophole, this does not get the defendants home free. Article XIX makes seniority as an engineer depend on when one became an engineer. Even if the "hired engineers" did not become engineers until they were promoted from the fireman's positions in which they were hired by the Santa Fe from their engineers' jobs elsewhere—even if they relinquished all their previous seniority as engineers and started over from the date they were promoted from their new rank of fireman— still they became engineers before the firemen promoted after them did. Similarly under Article XIX, the fireman who passes

his exam and becomes an engineer ahead of a more senior fireman would have greater seniority as an engineer because he became an engineer first, regardless of his relative seniority as a fireman. Since it is for the arbitrators and not for us to interpret the collective bargaining agreement, maybe there is some way around the apparent meaning of Article XIX. But the arbitrators did not go around it. They did not say, Article XIX means something different from what it says. They said, Article XIX is inapplicable—obsolete—kaput. And this looks like modification rather than interpretation.

But this takes too narrow a view of the arbitrators' job in this case. Although asked to interpret Article XIX, they could not do so in a vacuum. The Santa Fe is a party to another labor agreement, the UTU Training Agreement. The Santa Fe's duties under Article XIX of the BLE Agreement depend on how that article meshes with Article II of the UTU Training Agreement. That is a question of contract interpretation. When the arbitrators said that Article XIX was "obsolete," they meant—at least we think they meant, giving them the benefit of the doubt as we must—not (or not just) that they thought Article XIX misguided and anachronistic, but that it had been superseded by Article II of the Training Agreement. Article XIX is the older provision. It dates without material change from the time when firemen were a separate craft from engineers. In that era it made sense for engineers to have their own seniority roster. When the firemen's craft was abolished, which is essentially what happened in 1972, and firemen became apprentice engineers, the separate rosters ceased to make sense. The firemen's union, perhaps in compensation for the dramatic cut (90 percent) in the number of firemen, became responsible for the apprentice phase of what was now a single occupation. And it insisted in Article II of the training agreement that all engineers would start as firemen and that promotion to engineer would not disturb

the seniority established at the initial, fireman stage of employment.

■ This interpretation is not inevitable. Maybe the BLE Agreement is one of the agreements excepted by Article II.E of the UTU Training Agreement. Maybe some special force should be given the words "previously qualified" in Article II. A.2. On the other hand the fact that for at least six years before the arbitration the engineers' union had acceded to or at least had not protested the interpretation made by the railroad and the firemen's union was practical evidence that that interpretation was correct. But now we are straying into issues of contract interpretation, and that is not our province; that is the arbitrators' province. The only relevant point is that the meaning of Article XIX depends in part on the meaning of the overlapping contract with the firemen's union. Stated differently, the contractual relationship among the engineers' union, the firemen's union, and the railroad is defined by both contracts, and both must be construed in deciding the meaning of any provision. Stated still differently, the overlapping contracts created a "common law of the shop" (*United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960)) that the arbitrators, and they alone, could interpret to resolve a dispute over a particular provision in one contract. See, e.g., *Transportation-Communications Employees Union v. Union Pac. R.R., supra,* 385 U.S. at 161, 87 S.Ct. at 371; *Norfolk & Western Ry. v. Brotherhood of Railway Clerks,* 657 F.2d 596, 600 (4th Cir.1981). Just as it is contract interpretation when a court tries to figure out what the parties meant by an exchange of letters creating a contract between them, so it is contract interpretation when a labor arbitrator decides whether provisions in separate contracts are inconsistent and if so which provision should be given precedence as the most authentic expression of the parties' intent.

■ In sum, we read the arbitration opinion to have determined, using the two contracts and the course of conduct under

them as the raw materials of interpretation, that the understanding of the two unions and the carrier, as crystallized shortly after the signing of the UTU Training Agreement in 1972, was that that agreement, rather than the agreement with the engineers' union, would control the hiring of all new engineers, whether experienced or apprentice. In other words, Article XIX was superseded by tacit agreement of the parties. A determination that a contract has been modified by another contract, or by voluntary joint action of the parties, is itself contractual interpretation, and is within the jurisdiction of the arbitrators under the compulsory-arbitration scheme established by the Railway Labor Act. It does not matter whether the arbitrators decided the matter rightly or wrongly, sensibly or stupidly; they did not exceed their jurisdiction. The complaint was properly dismissed, though we disagree with the ground on which the district judge dismissed Count II. There will be no award of costs in this court.

AFFIRMED.