**NATIONAL RAILWAY LABOR CONFERENCE, et al., Plaintiffs-Appellees,**

v.

**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, et al., Defendants-Appellants.**

Nos. 87–1088, 87–1151 and 87–1298.

United States Court of Appeals, Seventh Circuit.

Argued June 5, 1987.

Decided Sept. 21, 1987.

■■■■■■

---

Michael S. Wolly, Mulholland & Hickey, Washington, D.C., for defendants-appellants.

Ralph J. Moore, Jr., Shea & Gardner, Washington, D.C., for plaintiffs-appellees.

Before COFFEY and FLAUM, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

In this action the district judge issued a preliminary injunction to maintain the status quo and preserve the jurisdiction of the administrative railway adjustment boards over two disputes the district judge concluded were "minor disputes" under the Railway Labor Act. *See* 45 U.S.C. § 151 *et seq.* The unions appeal the determination that the disputes are minor, the granting of the injunction against a strike, and its scope. The railroads appeal from the scope of the conditions on the injunction requiring them to maintain the status quo. We affirm the district court in all respects.

I

This litigation concerns two "third-party" contracts entered into in each instance between a railroad and a supplier of locomotives. Both contracts make the locomotive supplier responsible for the repair and maintenance of the locomotives. In both instances the unions argue that these third-party contracts violate existing collective bargaining agreements that the unions assert reserve such repair and maintenance work to their members. The railroads counter that the collective bargaining agreements authorize the third-party contracts.

The first third-party contract at issue involves a letter of intent entered into on September 4, 1986, by Illinois Central Gulf ("Illinois Central") and Helm Financial Corporation ("Helm") (the "Illinois Central-Helm" agreement), under which Helm agreed to supply Illinois Central with locomotives whose major maintenance Helm would select a subcontractor to perform. The locomotives would continue to be owned by Helms and others (but not Illinois Central). Illinois Central is a party to a 1964 national collective bargaining agreement (the "1964 Agreement") that provides in Article I, Section 2 in pertinent part, that protective benefits will be paid to employees adversely affected by certain specified kinds of transactions, the applicable one of which is "the lease or purchase of equipment ... [the] servicing or repairing of which is to be performed by the lessor or the seller."

In the second third-party contract at issue Burlington Northern ("Burlington Northern") on October 28, 1986, entered into an "Electrical Power Purchase Agreement" with Oakway, Inc. (the "Burlington Northern-Oakway" agreement), pursuant to which Oakway would provide to Burlington Northern certain levels of megawatt hours of electricity by means of locomotives supplied and maintained by Oakway. Burlington Northern is a party to a "local" collective bargaining agreement that modifies certain terms of the national 1964 Agreement. The local agreement, which is entitled the CB & Q Agreement No. 76–69, provides in pertinent part that: "Repair work covered by the classification of work rules on locomotives, acquired through purchase or lease, will not be subcontracted outside the warranty period...."

Union negotiators arranged a meeting with the railroads to assert their position that maintenance and repair work on locomotives provided to the railroads under such agreements should be performed by their own members. The railroads offered to submit the disputes to arbitration but refused to negotiate. The railroads some short time later filed an action for a preliminary injunction against any strikes over the third-party contracts in the United States District Court for the Northern District of Illinois. The district court determined that both disputes were "minor" disputes within the exclusive jurisdiction of

the appropriate special railway adjustment boards.[1] The court then enjoined the unions against striking under its power to issue an injunction to preserve the jurisdiction of the adjustment boards. The trial court conditioned this injunction on the railroad's maintenance of the status quo pending the adjustment boards' decisions.

While the two third-party disputes are the centerpiece of this litigation, they appeared during voting by several of the nation's railroad unions on the question of whether to approve a tentative collective bargaining agreement negotiated under section 6 of the Railway Labor Act between the unions and most of the nation's Class I railroads, who are represented in national negotiations by the National Railway Labor Conference, a plaintiff-appellee

here.[2] Two of the unions, the International Brotherhood of Electrical Workers ("Electrical Workers") and the International Association of Machinists and Aerospace Workers ("Machinists"), suspended the voting process when the negotiations over the third-party disputes broke down. Both unions then withdrew their recommendation supporting ratification of the agreement, communicated to their members their disfavor over the railroads' third-party contracts, and directed that a new vote be taken, recommending that their members vote in favor of a strike. The two unions voted to reject the tentative bargaining agreement in this second vote. A third union, the International Association of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers (the "Boilermakers"),

1. The Railway Labor Act provides that disputes within the National Railway Adjustment Board's jurisdiction may also be submitted to special adjustment boards created by the parties' consent in collective bargaining agreements. 45 U.S.C. § 153 Second. Both of the third-party contract disputes at issue here have been brought before special adjustment boards.

2. The individual carrier plaintiffs are:
   Alameda Belt Line
   Alton & Southern Railway Co.
   Atchison, Topeka, & Santa Fe Railway Co.
   Bessemer & Lake Erie Railroad
   Burlington Northern Railroad Co.
   Canadian National Railways, Canadian Pacific Limited
   Central of Georgia Railroad Co.
   CSX Transportation
      Baltimore and Ohio Railroad Co.
      Baltimore and Ohio Chicago Terminal Railroad Co.
      Chesapeake and Ohio Railway Co.
      CSX Transportation, Inc. (The former Seaboard System Railroad, Inc., which included the former Seaboard Coast Line Railroad and the former Louisville and Nashville Railroad Co. [including Monon])
   Chicago and Illinois Midland Railway Co.
   Chicago and Northwestern Transportation Co.
   Consolidated Rail Corporation
   Denver and Rio Grande Western Railroad Co.
   Des Moines Union Railway Co.
   Duluth, Missabe, and Iron Range Railway Co.
   Duluth, Winnipeg, & Pacific Railway
   Elgin, Joliet, & Eastern Railway Co.
   Galveston, Houston, & Henderson Railroad Co.
   Grand Trunk Western Railroad
   Houston Belt and Terminal Railroad Co.
   Illinois Central Gulf Railroad Co.

   Kansas City Southern Railway Co.
   Kansas City Terminal Railroad Co.
   Lake Superior Terminal & Transfer
   Los Angeles Junction Railway Co.
   Louisiana and Arkansas Railway Co.
   Manufacturers Railway Co.
   Milwaukee-Kansas City Southern Joint Agency
   Minnesota Transfer Railway Co.
   Missouri-Kansas-Texas Railroad Co.
   Missouri Pacific Railroad Co.
   New Orleans Public Belt Railroad
   Norfolk & Portsmouth Belt Line Railroad Co.
   Norfolk & Western Railway Co.
   Oakland Terminal Railroad
   Ogden Union Railway & Depot Co.
   Oklahoma, Kansas, and Texas Railroad Co.
   Peoria and Pekin Union Railway
   Portland Terminal Railroad Co.
   Port Terminal Railroad Association
   Richmond, Fredericksburg, & Potomac Railroad
   Sacramento Northern Railway
   St. Louis Southwestern Railway Co.
   Soo Line Railroad Co.
   Southern Railway Co.
      Alabama Great Southern Railroad Co.
      Cincinnati, New Orleans and Texas Pacific Railway Co.
      Georgia Southern and Florida Railway Co.
      New Orleans Terminal Co.
      St. Johns River Terminal Co.
      Atlantic and East Carolina Railway Co.
      Interstate Railroad Co.
      Carolina & Northwestern Tennessee Railway Co.
      Tennessee, Alabama and Georgia Railway Co.
   Terminal Railroad Association of St. Louis
   Texas Mexican Railway Co.
   Union Pacific Railroad Co.
   Western Pacific Railroad Co.

purported to reject the tentative national agreement by means of a declaration of the Boilermakers's President rejecting the agreement. These three unions are the defendants in the present action.[3]

Subsequent to the issuance of the injunction the unions moved the trial court to declare them free to strike over the rejected national agreements. The unions argued that the second vote had validly rejected the tentative agreement and brought the lengthy section 6 procedures to a close, thus allowing the unions to resort to self-help. The trial court denied the motion, however, reasoning that the third-party disputes had affected the ratification vote, and had become inextricably intertwined with the national negotiations.

On appeal the unions challenge the trial court's determination that the disputes are minor and the injunction preventing them from striking. The railroads challenge the scope of the status quo injunction issued against them. We have jurisdiction of the appeal under 28 U.S.C. § 1292(a)(1) to review the district court's granting of and refusal to modify the preliminary injunction.

## II

A. *"Major" and "Minor" Disputes under the Railway Labor Act*

The Railway Labor Act, as construed by the Supreme Court, establishes two different and distinct structures for resolving labor disputes on the nation's railways. *See* 45 U.S.C. §§ 151–160; *Elgin, Joliet & Eastern Railway v. Burley,* 325 U.S. 711, 722–27, 65 S.Ct. 1282, 1289–91, 89 L.Ed. 1886 (1945), *reaffirmed on reargument,* 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946); *see also Local 533 Transport Workers Union of America v. Eastern Air Lines, Inc.,* 695 F.2d 668, 673 (2d Cir. 1983) (as amended). The characterization

of a dispute as "major" or "minor" channels the dispute into the appropriate structure. If the dispute is major it is subject to section 6 of the Railway Labor Act, 45 U.S.C. § 156, and the parties are required to follow a long, drawn-out conciliation process, which includes negotiation between the parties, mediation by the National Mediation Board, and possibly a review and report by an emergency board appointed by the President. *See generally* 45 U.S.C. §§ 151–160; *see also Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969) (detailing the major disputes process). If at the end of this process the dispute is not resolved the parties may resort to self-help. *E.g., Brotherhood of Locomotive Engineers v. Atchison, Topeka, & Santa Fe Railway Co.,* 768 F.2d 914, 920 (7th Cir.1985); *Atchison, Topeka, & Santa Fe Railway Co. v. United Transportation Union,* 734 F.2d 317, 320 (7th Cir.1984). This procedure commands extensive and exhaustive bargaining but does not force a result; it is essentially conciliatory.

If, on the other hand, the court deems the dispute "minor" it is subject to section 3 of the Railway Labor Act, 45 U.S.C. § 153, and the parties (failing resolution in the normal grievance process) must submit their differences to the binding authority of an adjustment board, which exercises exclusive jurisdiction over the dispute. *E.g., Andrews v. Louisville & Nashville Railway,* 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972); *Atchison, Topeka, & Santa Fe Railway Co. v. United Transportation Union,* 734 F.2d 317, 320 (7th Cir.1984); *Chicago and Northwestern Transportation Co. v. United Transportation Union,* 656 F.2d 274, 277 (7th Cir. 1981).

Neither major nor minor disputes are explicitly defined in the Railway Labor

---

3. There are three other "shopcraft" unions besides the defendants. They are the the Brotherhood of Railway Carmen—Division of BRAC ("Railway Carmen"), the International Brotherhood of Firemen and Oilers ("Firemen & Oilers"), and the Sheet Metal Workers' International Association ("Sheet Metal Workers"). The

Sheet Metal Workers signed a national agreement prior to the institution of this suit and was never a party. Both the Railway Carmen and Firemen & Oilers were initially named as defendants, but were dismissed after they both signed national agreements.

Act itself. This terminology is drawn from judicial gloss on the statute, originating with the Supreme Court's opinion in *Burley*. *Burley*, 325 U.S. at 722–27, 65 S.Ct. at 1289–91. The case law establishes that major disputes are those over the formation or alteration of collective bargaining agreements while minor disputes are those over the interpretation of existing collective bargaining agreements. A major dispute is over the acquisition of a new right or the imposition of a new duty, while a minor dispute seeks to enforce an accrued right by reference to an existing collective bargaining agreement.[4] *E.g., Burley*, 325 U.S. at 723, 65 S.Ct. at 1290; *see also, e.g., Atchison, Topeka, & Santa Fe Railway Co.*, 768 F.2d at 920; *Atchison, Topeka, & Santa Fe Railway Co.*, 734 F.2d at 320; *Eastern Air Lines, Inc.*, 695 F.2d at 673–74; *Chicago and Northwestern Transportation Co. v. United Transportation Union*, 656 F.2d 274 (7th Cir.1981). Where the parties disagree over whether the dispute can be resolved by reference to an agreement the dispute is minor unless the claims of contractual justification are "frivolous" or "obviously insubstantial." *Maine Central Railroad Co. v. United Transportation Union*, 787 F.2d 780, 783 (1st Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986); *Atchison, Topeka, & Santa Fe Railway Co.*, 734 F.2d at 321; *Eastern Air Lines, Inc.*, 695 F.2d at 673–74; *Chicago and Northwestern Transportation Co. v. United Transportation Union*, 656 F.2d at 278–79 (collecting cases); *United Transportation Union v. Baker*, 499 F.2d 727, 731 (7th Cir.), *cert. denied*, 419 U.S. 839, 95 S.Ct. 69, 42 L.Ed. 2d 66 (1974). This is a necessary adjunct of the need to protect the adjustment board's exclusive jurisdiction over minor disputes; this concern supports the additional corollary that "when in doubt, the court construes disputes as minor." *Atchison, Topeka, & Santa Fe Railway Co.*, 768 F.2d

at 920. One other inquiry made by courts is whether the proposed reliance on the agreement is so insubstantial that the court must conclude that the railroad is attempting to circumvent the major dispute procedures of the Railway Labor Act. *E.g., Maine Central Railroad Co.*, 787 F.2d at 783; *Baker*, 499 F.2d at 730.

■ Some circuit courts have also held that an established past practice with regard to the issues in dispute may itself serve as a term of an agreement for the purposes of determining whether a dispute is minor or major. *E.g., Maine Central Railroad Co. v. United Transportation Union*, 787 F.2d 780, 782–84 (1st Cir.1986). This argument rests in part on a reading of language in the Supreme Court's opinion of *Detroit and Toledo Shoreline Railroad v. United Transportation Union*, 396 U.S. 142, 153–54, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969). In that case the Supreme Court was faced with a challenge to the scope of a status quo injunction in a major dispute. There, the Court announced that:

> We have stressed that the status quo extends to those actual, objective working conditions out of which the dispute arose, and clearly these conditions need not be covered in an existing agreement. Thus, the mere fact that the collective agreement before us does not expressly prohibit outlying assignments would not have barred the railroad from ordering the assignments that gave rise to the present dispute if, apart from the agreement, such assignments had occurred for a sufficient period of time with the knowledge and acquiescence of the employees to become in reality a part of the working conditions.

*Id.; see also United Transportation Union v. Illinois Terminal Railroad Co.*, 471 F.2d 375, 380 (7th Cir.1972). This language specifically addresses the question of how a court should determine the scope of a

---

4. Collective bargaining agreements in the railroad industry generally do not expire on a given date but instead continue in effect until superseded by a subsequent agreement. *E.g., Brotherhood of Railroad Trainmen v. Akron & Barberton Belt Railway Co.*, 385 F.2d 581 (D.C.Cir. 1967), *cert. denied*, 390 U.S. 923, 88 S.Ct. 851, 852, 856, 19 L.Ed.2d 983 (1968). The last contract involved in this action provided that no change in the agreement would occur prior to July 1, 1984, and no proposal to change the agreement could be served prior to April 1, 1984.

status quo injunction in a major dispute, not the question of whether a party may call on past practice in attempting to show that a dispute can (or cannot) be settled by reference to an existing agreement (thus establishing whether the dispute is major or minor). *See, e.g., Brotherhood of Railway Carmen of the United States and Canada v. Norfolk and Western Railway Co.,* 745 F.2d 370, 377 (6th Cir.1984). This does not mean that arguments based on past practice are necessarily irrelevant to the characterization of a dispute as major or minor. *Detroit & Toledo Shore Line* noted, for example, in a general discussion of the purposes of the Railway Labor Act, that "[w]here a condition is satisfactorily tolerable to both sides, it is often omitted from the agreement, and it has been suggested that this practice is more frequent in the railroad industry than in most others." *Detroit & Toledo Shore Line,* 396 U.S. at 155, 90 S.Ct. at 302. Collective

bargaining agreements in the railroad industry are, of course, contracts, and the custom and usage in the trade or the past course of dealing among the parties may well be relevant to a determination of any ambiguity in the contractual language. *E.g., Railway Carmen,* 745 F.2d at 377. As the Fourth Circuit has noted, however, the relevance of such arguments is more limited in the characterization of the dispute than it is in the resolution of the merits; for example, contractual language clearly prohibiting a certain action generally makes nonfrivolous an argument that the practice is prohibited—no matter what the past practice. *See Brotherhood of Railway Carmen,* 745 F.2d at 377. Thus it is apparent that arguments from past practice may be relevant to the characterization of a dispute as major or minor, but it is also true that they will most often have only a limited impact on the characterization.[5]

---

5. The Second Circuit has suggested that a court should consider the magnitude of the impact on the railroad's operations and the union's interests in characterizing the dispute as major or minor. *Local 553, Transport Workers Union of America v. Eastern Air Lines, Inc.,* 695 F.2d at 673–74; *see also Rutland Railway Corp. v. Brotherhood of Locomotive Engineers,* 307 F.2d 21, 36 (2d Cir.1962) (noting that it doubted that the Supreme Court had adopted substantial impact analysis in *Order of Railroad Telegraphers v. Chicago & Northwestern Railroad Co.,* 362 U.S. 330, 341, 80 S.Ct. 761, 767, 4 L.Ed.2d 774 (1960), but concluding that even if it had the analysis would not change the result in *Rutland Railway* ). Under this line of analysis, a dispute with a substantial impact would suggest a major dispute while a negligible impact would point to a minor dispute. This theory is based on the supposition that "major" and "minor" describe actual pragmatic differences in the scope of the impact of the dispute on the practices of the parties. *E.g., Local 553, Transport Workers Union of America v. Eastern Air Lines, Inc.,* 695 F.2d at 673–74. Since the distinction between the two is based on whether or not there is a nonfrivolous argument that reference to a collective bargaining agreement will resolve the dispute, it seems unlikely that the magnitude of the actual impact of the disputed practice can change the characterization of the dispute. There is no necessary connection between the magnitude of the impact of a practice and its inclusion in (or exclusion from) a collective bargaining agreement. Indeed, one might argue that the absence of a practice from a collective bargaining agreement would more likely suggest that its impact would be minor—which

is the opposite inference from that applied by the courts that have used substantial impact analysis. We believe that the language in the Supreme Court's cases on which the Second Circuit relies is more likely properly construed as addressing Congress's motives for establishing a system that distinguishes between "major" and "minor" disputes. *See Detroit and Toledo Shoreline Railroad v. United Transportation Union,* 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969); *Railroad Telegraphers,* 362 U.S. at 341, 80 S.Ct. at 767, 4 L.Ed.2d 774 (1960); *see also Burley,* 325 U.S. at 722–27 & n. 16, 65 S.Ct. at 1289–91 & n. 16. Once having decided to make this distinction, Congress set the dividing line in reference to whether the dispute was controlled by an agreement, *see* 45 U.S.C. §§ 151a(4), 151a(5), and thus did not directly rely on the actual impact of the dispute. *See, e.g., Brotherhood of Locomotive Engineers v. Atchison, Topeka, & Sante Fe Railway Co.,* 768 F.2d 914, 920 (7th Cir.1985) (describing the distinction as based on whether the dispute can be resolved by reference to a collective bargaining agreement). We think the district judge was correct to find that impact analysis was of little relevance to the characterization of the dispute; even assuming that it is relevant it does not alter our result. The district court found that in the past instances of established practice set forth by the railroads "the various sort of agreements with third party suppliers resulted in, as here, the loss of work by the carriers' own shopcraft employees." Mem.Op. (Dec. 17, 1986) at 13; J.A. at 14. Despite the contrary arguments of the unions we do not think this finding clearly erroneous, and when this dispute is viewed in its light we are

While the paradigmatic formulation of this major/minor distinction is easy to recite, it has been somewhat more difficult to apply. *Eastern Air Lines, Inc.*, 695 F.2d at 673. The placement of the line distinguishing an alteration of an agreement from an interpretation of it can appear to shift with the varying perspectives of the parties affected. *Atchison, Topeka, & Santa Fe Railway Co.*, 768 F.2d at 920. As we have recently observed: "A refusal to follow apparently clear contractual language could be a unilateral modification of the contract, thereby generating a major dispute, or a bold and possibly erroneous interpretation of the contract, thereby generating a minor dispute." *Id.*

■ With these guidelines in mind we turn to the provisions of the third-party contracts at issue in this appeal. The Illinois Central-Helms agreement presents no great challenge under this test; whatever the ultimate merits of the Illinois Central's interpretation of the 1964 Agreement, there is no doubt that the Illinois Central has presented a nonfrivolous argument that the agreement allows third-party contracts like the Illinois Central-Helms letter of intent. The agreement provides for the payment of certain benefits to those employees adversely affected by certain specified types of transactions, including the "[l]ease or purchase of equipment ... the ... servicing and repair of which is to be performed by the lessor or the seller." One immediately apparent possible interpretation of this provision is that such contracts were specifically envisioned and the parties agreed that if the Illinois Central were to enter into such contracts it could do so on the condition that it pay the compensatory benefits outlined in the agreement. This is not the only possible interpretation, but it is perfectly plausible, and much more than enough to prevent us from characterizing it as frivolous.

■ The Burlington Northern-Oakway agreement is subject to a local collective bargaining agreement, CB & Q Agreement 76–69, which in effect provides that Burlington Northern's employees have the right to perform the repair and maintenance work necessary on all locomotives Burlington Northern "acquire[s]" by "purchase" or "lease." The Burlington Northern-Oakway agreement explicitly provides that Burlington Northen is granted no "ownership" or "leasehold" interest in the locomotives provided by Oakway. Burlington Northern argues that under the Burlington Northern-Oakway agreement Burlington Northern is not purchasing or leasing the locomotives that Oakway would use to provide the power to pull Burlington Northern's train; its agreement is only to purchase the electrical power those locomotives will produce in pulling Burlington Northern's trains. The district court determined that "[h]owever improbable BN's [Burlington Northern's] contractual justification may be, it is nonetheless 'plausible.'" Mem.Op. (Dec. 17, 1986) at 12, J.A. at 13. We agree. The resolution of the case depends upon the interpretation of the agreement, and while we realize that the Burlington Northern's actions might be in violation of that agreement, it is for the appropriate adjustment board, and not this court, to draw the boundaries of the practices allowed by the agreement. *Carbone v. Meserve*, 645 F.2d 96, 100 (1st. Cir.) (concluding in a case where the railroad's action appeared to conflict with the language of the bargaining agreement that "[i]n sum, there may be a violation of the contract, but this is a question of interpretation, and as such is outside of our jurisdiction"), *cert. denied*, 454 U.S. 859, 102 S.Ct. 312, 70 L.Ed.2d 156 (1981). We recognize that leases may exist in many forms and that the lessee often maintains the right to use the leased equipment or property subject to various restrictions. Therefore, it is entirely conceivable that the purchase agreement might be considered a lease for the purposes of the collective bargaining agreement despite the express representation to the contrary. Nevertheless, it is not the prerogative of this court

---

constrained to conclude that even applying substantial impact analysis, the dispute's impact is not so significant that it should be considered

major even though it can be resolved by reference to an extant collective bargaining agreement.

to define when a contract loses its character as a lease and instead becomes a purchase of goods and services for the purpose of collective bargaining agreements under the supervision of a railway adjustment board. We are unwilling to conclude that the Burlington Northern's proferred interpretation of the collective bargaining agreement is an attempt to circumvent the major disputes process rather than to test the limits of the bargaining agreement.

Burlington Northern points to other third-party contracts it has made in the past to support its claim that established past practice supports its position that it can enter into contracts allowing third parties to repair and maintain rolling stock used in Burlington Northern's trains. The district court determined that in each of these "many previous actions" the

> various sorts of agreements with third party suppliers resulted in, as here, the loss of work by the carriers' own shopcraft employees.....
>
> The Court agrees with the unions' assertion that the present BN–Oakway agreement may be distinguished factually from BN's past practices. There are, however, substantial similarities between the past and present arrangements, and 'it is not the court's role to choose or speculate as to their practical effect.'

Mem.Op. (Dec. 17, 1986) at 13, J.A. at 14 (quoting *Maine Central*, 787 F.2d at 783).

■ The Burlington Northern-Oakway arrangement thus presents an admittedly more questionable contract interpretation than the Illinois Central-Helm agreement, but the fact that a contract interpretation is questionable, and may be wrong, does not make it frivolous. It has been held before that where a collective bargaining agreement is susceptible of a nonfrivolous interpretation allowing job abolition, disputes over actions effecting such job abolition are minor. *E.g., United Transportation Union v. Penn Central Transportation Co.,* 505 F.2d 542 (3d. Cir.1974); *cf. Rutland Railway Corp. v. Brotherhood of Locomotive Engineers,* 307 F.2d 21, 35 (2d Cir.1962) (a railroad retains some scope of management prerogative even if only im-

plicit, which must be taken into account in interpreting the reasonableness of a railroad's argument based on an agreement). The Railway Labor Act provides adjustment boards with exclusive jurisdiction to interpret collective bargaining agreements in the railroad industry. Given Congress's clear intent to exclude courts from such matters and recognizing the greater expertise of the adjustment boards in evaluating claims regarding past practices and the agreements they oversee, we are constrained to conclude that in this close case we must resolve our doubts in favor of concluding that this is a dispute over a "bold and possibly erroneous interpretation of the contract, thereby generating a minor dispute." *Atchison, Topeka, & Santa Fe Railway Co.,* 768 F.2d at 920.

### B. *The Injunction*

■ A federal court has only limited power to order an injunction to maintain the status quo in the setting of a minor dispute. The general rule is that a railroad may "continue to apply its interpretation of the agreement during the pendency of a minor dispute." *Brotherhood of Locomotive Engineers v. Boston & Maine Corp.,* 788 F.2d 794, 799 (1st Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 111, 93 L.Ed.2d 59 (1986). Because the dispute itself is within the exclusive jurisdiction of the railway adjustment board the Supreme Court has ruled that the federal courts may issue an injunction against strikes arising out of minor disputes in order to effect the purpose of the Railway Labor Act to provide for compulsory arbitration in such disputes. *Brotherhood of Railroad Trainmen v. Chicago River & Indian Railway Co.,* 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); *see also Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railway Co.,* 363 U.S. 528, 531, 80 S.Ct. 1326, 1328, 4 L.Ed.2d 1379 (1960) (*"M–K–T"*). The Court noted in *M–K–T* that this very reason for empowering the district courts to enjoin a union strike during a minor dispute, *see Chicago River* at 353 U.S. at 36–40, 77 S.Ct. at 638–41, also in logic required that district courts be empowered to attach conditions enjoining the railroads from engag-

ing in any self-help that might also undermine the jurisdiction of the Board, and therefore vitiate the purpose of the minor disputes process to require compulsory arbitration. *M–K–T*, 363 U.S. at 534, 80 S.Ct. at 1330. In *M–K–T* the Court held that injunctions restraining unions from striking during minor disputes could be qualified by conditions against self-help by the railroad "at least where they [the conditions] are designed not only to promote the interests of justice, but also to preserve the jurisdiction of the Board." *M–K–T*, 363 U.S. at 534, 80 S.Ct. at 1330 (1960). Thus the *M–K–T* Court found that the power to attach such conditions, and the guidelines for doing so, stemmed in part from the need to effect the design of the resolution process mandated for minor disputes by Congress.

■ The Court also traced the district court's power to attach conditions to the injunction in part to "the typical power of a court of equity ... to impose conditions requiring the maintenance of the *status quo.*" *Id.* at 531–32, 80 S.Ct. at 1329.[6] The Court reasoned that "[s]ince the power to condition relief is essential to ensure that extraordinary remedies will not become the engines of injustice, it would require the clearest legislative direction to justify the truncation of that power." *M–K–T*, 363 U.S. at 532, 80 S.Ct. at 1329.

Thus the teaching of *M–K–T* is that if an injunction against union strike activity is issued in a minor dispute the district court retains its traditional equitable power to balance "competing claims of irreparable hardship" in light of the Railway Labor Act's mandate that the guideline for fashioning the injunction be the preservation of the Board's jurisdiction. *Id.* at 534–35, 80 S.Ct. at 1330.

■ Such an injunction is eminently appropriate in the circumstances of this case. On the one hand, a strike by the unions would allow them to engage in self-help that would cause great economic stress and violate the Act's requirement of compulsory arbitration for this type of dispute. Thus the union is properly enjoined under the *Chicago River* doctrine from striking on the third-party disputes. On the other hand, effecting further contracts like the Illinois Central-Helms and Burlington Northern-Oakway agreements may well make pragmatically impossible any truly complete remedial order of the adjustment board decisions should they favor the unions' position in either dispute. Thus conditions on the injunction requiring the railroad to forebear from effectuating further contracts and displacing workers under the already effectuated contracts is proper in order to preserve the Board's jurisdiction.[7]

6. The Court explained the character of this power by quoting leading cases discussing the general, equitable power of a court to consider injunctions and conditions attached to them. *M–K–T*, 363 U.S. at 532, 80 S.Ct. at 1329 (quoting *Yakus v. United States*, 321 U.S. 414, 440, 64 S.Ct. 660, 674–75, 88 L.Ed. 834 (1944)) ("The award of an interlocutory injunction by courts of equity has never been regarded strictly as a matter of right, even though irreparable injury may otherwise result to the plaintiff..... [The court] will avoid ... injury so far as may be, by attaching conditions to the award."); *id.* (quoting *Inland Steel Co. v. United States*, 306 U.S. 153, 157, 59 S.Ct. 415, 417–18, 83 L.Ed. 557 (1939)) ("[I]t is the duty of a court of equity granting injunctive relief to do so upon conditions that will protect all ... whose interests the injunction may affect.")

7. This appeal involves a preliminary injunction and the district court, as it recognized, was under an obligation to apply the traditional standards necessary for determining whether or not to issue a preliminary injunction, as well as

to heed the particular concerns presented by the requirements of the Railway Labor Act. *See, e.g., M–K–T*, 363 U.S. at 531–35, 80 S.Ct. at 1329–30 (tracing power of district court to attach conditions on railroad activity to an injunction against a strike by the unions in a minor dispute to traditional equitable factors as well as to the statutory purposes of the Railway Labor Act); *Atchison, Topeka, & Santa Fe Railway Co. v. United Transportation Union*, 734 F.2d 317, 319–21 (7th Cir.1984) (applying traditional equitable standards in the light of the specific requirements of the Railway Labor Act); *see also Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429 (7th Cir.1986) (describing general rules governing injunctions); *American Hospital Supply Corp. v. Hospital Products, Ltd.*, 780 F.2d 589 (7th Cir.1986) (same); *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380 (7th Cir.1984) (same). This the district judge did and on appeal the parties have based their challenges not on the application of the traditional factors, but rather on the additional requirements applicable under the Railway Labor Act

■ The unions do not dispute the fact that until the third-party disputes occurred they had recommended ratification of a tentative national agreement to their members and were conducting ratification votes. After they learned of the third-party disputes, however, the Electrical Workers and the Machinists halted the voting among their members, withdrew their recommendation, and resubmitted the vote to their members with the recommendation that the members reject the tentative national agreement. The president of the Boilermakers purported to reject the tentative national agreement on his own authority. The district court found from this background that the minor third-party disputes had affected the ratification vote (a finding that we cannot say is clearly erroneous) and therefore ruled that the injunction against a strike on third-party disputes could not be avoided by engineering a strike that coupled the third-party disputes .with a purported rejection of the tentative national agreement. We agree; any other course would enable the unions, through the fortuitous timing of the minor disputes, to engage in a strike on issues that the Railway Labor Act has determined must be submitted to the binding arbitration of the railway adjustment boards.

It is true that the union claims that it now wishes to strike on the "moratorium" provision of the tentative national agreement (which purports to prohibit the service of any section 6 notices prior to July 1, 1988), on which the union asserts the parties have exhausted the appropriate procedures without agreement. However, the union's position in this regard was rejected by the finding of the district court that the union's position on the major dispute was in fact inspired by the minor disputes. We have noted that this finding is not clearly erroneous on the record before this court, and we reiterate the observation of the Second Circuit that in reviewing the contentions of the parties with regard to whether a dispute is minor or major, courts "must not place undue emphasis on the contentions or maneuvers of the parties." *Rutland Railway Corp. v. Brotherhood of Locomotive Engineers*, 307 F.2d 21, 33 (2d Cir.1962); *see also Airline Flight Attendants in Service of Texas International Airlines*, 411 F.Supp. 954, 961 (S.D.Tex. 1976) (refusing to give effect to a section 6 notice because the facts revealed that the notice was not a bona fide effort to change the collective bargaining agreement but instead an effort to make a minor dispute appear major), *aff'd mem.* 566 F.2d 104 (5th Cir.1978).[8]

■ The Burlington Northern, for its part, also appeals from the district court's refusal to clarify the scope of the status quo injunction issued against it. The railroads specifically object in their cross-appeal to the prohibition against entering into any more third-party contracts and to the prohibition against furloughing repair and maintenance workers for reasons tied up with effecting the Illinois Central-Helms and Burlington Northern-Oakway agreements. Such conditions were not beyond the district court's power to preserve the board's jurisdiction. There is no doubt that allowing the railroads to enter into other third-party agreements pending the adjustment boards' decisions could effectively produce an empty victory should the boards decide in the unions' favor. Unscrambling the many obligations such new contracts would involve and restructuring the operation of the railroads to return them to what is now the status quo might well be totally unworkable.

In regard to the furloughs the Supreme Court has made clear that the discharge or relocation of employees from positions long-held can suffice to support the placing of a condition upon railroads preventing them from making such discharges. In the

---

and whether the *scope* of the injunctive provisions is wider than that necessary to prevent irreparable harm and preserve the adjustment boards' jurisdiction. We therefore confine our discussion of the injunction to these concerns.

8. The issue of whether the unions had effectively ratified the tentative agreement prior to their decision to withdraw the agreement from the voting process is not before this court on appeal, and we express no opinion on its resolution.

*M–K–T* case the proposed change would have displaced some employees from their homes and would have required the discharge of others. In holding that conditions on a strike injunction in a minor dispute requiring the railroads to maintain the status quo were justified, the Court noted:

> The dispute out of which the judicial controversy arose does not merely concern rates of pay or job assignments, but rather involves the discharge of employees from positions long held and the dislocation of others from their homes. From the point of view of these employees, the critical point in the dispute may be when the change is made, for, by the time of the frequently long-delayed Board decision, it might well be impossible to make them whole in any real sense. If this be so, the action of the district judge, rather than defeating the Board's jurisdiction, would operate to preserve that jurisdiction by preventing injury so irreparable that a decision of the Board in the unions' favor would be but an empty victory.

*M–K–T,* 363 U.S. at 534, 80 S.Ct. at 1330. The district court's order here did no more than issue a preliminary injunction in a similar situation, and therefore we conclude that it did not abuse its discretion in attaching such conditions.[9]

 The railroads nevertheless argue that the scope of the conditions is too broad in that it includes employees who would have been furloughed even had the Burlington Northern-Oakway agreement not gone into place. As we have already stated, however, the district court retains the power to consider whether any actions taken by the railroad are in the ordinary course of business or whether they are the result of entering into the Burlington

Northern-Oakway or Illinois Central-Helms agreements. The simple fact of the matter is that the district court concluded, in the one specific instance presented to it, that what the railroad could have done absent the Burlington Northern-Oakway agreement was irrelevant to the question of whether the furloughs Burlington Northern actually effected were in fact tied up with the execution of the Burlington Northern-Oakway agreement. The district court found that the employees were furloughed "due to a lesser need for running repair work on locomotives caused by the Oakway arrangement." This finding was not clearly erroneous on the information presented to the court, and given the court's conclusion regarding the actual effect of the Oakway arrangement on the employees it was not required to speculate with regard to how many, if any, employees Burlington Northern would have laid off had some other hypothetical situation occurred.

Injunctions must be crafted as carefully as possible, but they are inherently equitable creatures that must retain enough breadth to prevent the actions they are designed to prohibit. The district court has acted admirably in striking the rough balance that a status quo injunction requires, *see, e.g., Lawson,* and we will not straightjacket it in its ability to consider future disagreements, if any, over the application of the injunction to particular circumstances.

### III

In accordance with the foregoing opinion, we Affirm the district court.

---

9. The NRLC has cited several cases to us in support of its argument that loss of pay, loss of employment, and temporary difficulty at finding new employment do not constitute the irreparable harm necessary to justify a preliminary injunction where a sufficient monetary remedy is available. We are not entirely convinced that a later monetary remedy would suffice to make the employees whole in the realistic sense required by *M–K–T.* Even assuming, *arguendo,* that such a remedy might be sufficient we must also point out that none of the cases the NRLC has cited are Railway Labor Act cases and therefore are insufficient to displace the controlling holding of the Supreme Court in *M–K–T* on this very issue. Several months have already elapsed since the entry of the preliminary injunction and we are unwilling to conclude that the irreparable harm to the union employees sought to be avoided in *M–K–T* would be avoided here if the injunction were now lifted.