**CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, a corporation, Plaintiff-Appellee,**

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION NO. 214, a voluntary association and Ellis Johnson, individually and as General Chairman, Defendants-Appellants.**

No. 86–3138.

United States Court of Appeals, Seventh Circuit.

Argued May 21, 1987.

Decided Sept. 18, 1987.

Michael S. Wolly, Mulholland & Hickey, Washington, D.C., for defendants-appellants.

Stuart F. Gassner, Chicago and North Western Transp. Co., Chicago, Ill., for plaintiff-appellee.

Before COFFEY and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

Local 214 of the International Brotherhood of Electrical Workers, and its General Chairman, Ellis Johnson ("the Union") appeal from an order of the district court that enjoined them from striking against the

Chicago and North Western Transportation Company ("CNW") and denied their cross-motion for injunctive relief. The order was initially issued as a preliminary injunction, but was subsequently made permanent by the district court. The appeal turns on whether the dispute between the Union and CNW is "minor" or "major" for purposes of sections 2, 3 Second and 6 of the Railway Labor Act, 45 U.S.C. §§ 152, 153 Second and 156. We conclude that the district court correctly determined that the dispute is a minor one. Accordingly, we affirm the judgment of the district court.

I

The International Brotherhood of Electrical Workers is the exclusive bargaining agent for all electricians employed by CNW in its railroad operations. The parties operate under the terms of a collective bargaining agreement that, although frequently amended, has been in force since its initial adoption in 1921. This contract comprehensively defines the duties, rules, rates of pay and working conditions of all CNW electricians. The contract contemplates two methods under which electricians may be paid: hourly and monthly. "Hourly" employees are paid a specified rate per hour from the time they leave their home station to the time they return to that station; they are also paid overtime for work in excess of eight hours per day. "Monthly" employees are paid a set sum based on a specified average number of work hours each month. They must be "on duty" 24 hours per day, six days a week and are frequently required to travel overnight; they receive no overtime pay except for work done on Sundays.[1]

Many of the electricians employed by CNW and represented by the Union are linemen engaged in the maintenance and repair of the signal system that serves CNW's rail operations. Most are classified as "linemen-electricians," and are paid on a monthly basis. Nevertheless, the contract does include a provision for linemen to be paid on an hourly basis and assigned to a specific station and accompanying area.[2]

In 1976, CNW and the Union began a series of discussions concerning changes in the pay and job classifications of electricians. These discussions were conducted pursuant to section 6 of the Railway Labor

---

1. The relevant contract provisions, in pertinent part, are as follows:

Rule 70—*Regularly Assigned to Road Work—Hourly Basis*

Employees regularly assigned to road work whose tour of duty is regular and who leave and return to home station daily (aborting car to be considered a home station), shall be paid continuous time from time of leaving home station until the time they return, whether working, waiting, or traveling, exclusive of meal period, as follows: straight time rate for all hours traveling and waiting on assigned work days. Time and one-half rate for all hours traveling and waiting on rest days and holidays. Straight time rate for work during regular hours and overtime rate for work performed during overtime hours. . . .

\* \* \* \* \* \*

Rule 71—*Road Work—Monthly Basis*

Monthly rates paid employees regularly assigned to road work represent a comprehended monthly hourage of 232.7 hours; no overtime is allowed for time worked in excess of eight hours per day; on the other hand, no time is to be deducted unless the employee lays off of his own accord.

These employees shall be assigned one regular rest day per week, Sunday, if possible. Over-time rules applicable to other employees coming within the scope of this Agreement shall apply to service performed on such assigned rest day. On the sixth day of the work week, employees will not be required to perform ordinary maintenance or construction work not heretofore required on Sundays and on holidays. Straight time hourly rate of these monthly rated employees shall be determined by dividing the monthly rate by 232.7.

2. Rule 76—*Linemen—Communications Department*

\* \* \* \* \* \*

An electrician stationed at a designated headquarters, who is qualified both as electrician and lineman, and who, subordinate to the foreman of the district, has charge of and is responsible for repairs and maintenance of line and equipment in a more or less definitely limited subdivision, or subdivisions of the foreman's district shall be classified as a station lineman.

(Note: A station lineman works upon ordinary repairs and maintenance in any part of the foreman's district, but under ordinary circumstances remains upon the subdivision or subdivisions maintained from his headquarters. He is available in emergencies upon other districts.)

Act, 45 U.S.C. § 156, which concerns proposals for modification of the terms of a contract itself. In 1984, CNW proposed conversion of all linemen-electrician positions to hourly-rate positions. After mediation was instituted, the Union agreed in principle to the conversion of positions. However, no agreement was reached because the two sides could not agree on the length of time necessary for phasing in the change to the hourly rate. Throughout these negotiations, CNW asserted that it could make the conversion to the hourly rate unilaterally without violating the contract, a position that the Union characterizes as a "threat" made in the context of negotiations. In December 1985, the contract was amended and renewed by the parties with no change in the pay rates or job classifications applicable to electricians.

In May 1986, a monthly-rated lineman-electrician posted at DeKalb, Illinois resigned his position. Rather than reposting the same position (or eliminating it entirely), CNW posted a new position for an hourly-rated station-lineman. The former lineman-electrician position was abolished. When the Union protested, CNW reiterated its position that it could shift positions within the contract. Ultimately, the Union threatened to strike, and CNW filed this action to obtain an anti-strike injunction. The Union filed a cross-motion for injunctive relief, in which it asked the district court to order CNW to reinstate the monthly-rated position.

The district court granted CNW's motion for a preliminary injunction against the threatened strike. The court held that the dispute between CNW and the Union involved the *application* of the collective bargaining agreement, not its creation or modification; thus it was a minor dispute subject to arbitration. The Union's cross-motion was denied. After an additional hearing, the injunction was made permanent.

## II

The sole issue on appeal is whether the dispute between the Union and CNW over CNW's ability to replace unilaterally a monthly-rated lineman's position with an hourly-rated one is a "major" or "minor" dispute, as those terms are employed under the Railway Labor Act, 45 U.S.C. §§ 151–163.

### A. *The Major-Minor Distinction*

Whether a dispute is major or minor depends on the relationship of the dispute to the collective bargaining agreement. A minor dispute is a dispute over interpretation of an existing contract; a major dispute is an attempt to create a contract or change the terms of a contract. *See, e.g., Brotherhood of Locomotive Eng'rs v. Atchison, T. & S.F. Ry.*, 768 F.2d 914, 920 (7th Cir.1985). The classic formulation of this major/minor distinction is set forth in *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 1289–90, 89 L.Ed. 1886 (1944):

> The first ["major"] relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.
>
> The second class ["minor"], however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries. In either case, the claim is to rights accrued, not merely to have new ones created for the future.

The consequences of characterizing a dispute as major or minor are of

great significance because the dispute resolution procedures set forth in the RLA for each are very different. Justice Harlan set forth the major dispute procedures and the accompanying "status quo requirement" in *Railroad Trainmen v. Terminal Co.*, 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969):

> The act provides a detailed framework to facilitate the voluntary settlement of major disputes. A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services sua sponte if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent. §§ 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the status quo. §§ 2 Seventh, 5 First, 6, 10.

If all these efforts fail, the union may strike. *Brotherhood of Railroad Trainmen v. Chicago R. & I.R.R.*, 353 U.S. 30, 42 n. 24, 77 S.Ct. 635, 641 n. 24, 1 L.Ed.2d 622 (1957); *Missouri P.R.R. v. United Transp. Union*, 782 F.2d 107, 110–11 (8th Cir.1986). Minor disputes, by contrast, must be referred to binding arbitration under the auspices of the National Railroad Adjustment Board ("NRAB"), 45 U.S.C. § 153 Second, and may not be the subject of strikes. The federal courts may act to protect the jurisdiction of the NRAB by enjoining strikes over minor disputes. *Chicago R. & I.R.R.*, 353 U.S. at 41–42, 77 S.Ct. at 640–41; *Atchison, T. & S.F. Ry. v. United Transp. Union*, 734 F.2d 317, 320 (7th Cir.1984).

The foregoing description of the differences between major and minor dispute resolution procedures under the RLA emphasizes the limited authority of the federal courts under the Act. The authority of the district court is limited to protecting the jurisdiction of the NRAB, the exclusive arbiter of minor disputes. Therefore, the federal court does not inquire into the merits of the underlying dispute except to the extent necessary to determine whether that dispute may be properly characterized as one involving the meaning of the contract provision. If, after referring to the existing collective bargaining agreement, the district court concludes that there is substance to the railroad's claim that it is acting within the terms of that agreement, the court's inquiry is concluded; the dispute is minor, and the court may invoke its injunctive power to preserve the jurisdiction of the NRAB.

In undertaking this limited inquiry, the fundamental test is "whether the conflict can be resolved by reference to an existing agreement." *Atchison, T. & S.F. Ry. v. United Transp. Union*, 734 F.2d at 321. However, as the court pointed out in *Brotherhood of Locomotive Eng'rs v. Atchison, T. & S.F. Ry.*, 768 F.2d at 920, the distinction between major and minor disputes can be a difficult one to make. We have described the distinction as "imprecise," *Atchison, T. & S.F. Ry. v. United Transp. Union*, 734 F.2d at 320, and "often fuzzy," *Brotherhood of Locomotive Eng'rs v. Atchison, T. & S.F. Ry.*, 768 F.2d at 920. It is indeed possible that, in some instances, an act might be characterized either as a unilateral attempt to modify the contract (giving rise to a major dispute), or as a "bold and possibly erroneous interpretation of the contract," *id.*, (giving rise to a minor dispute). In plain terms, one party's "modification" may be the other's "interpretation."

"Since the machinery for resolving major disputes is conciliatory rather than binding, a major dispute can escalate into a strike, which in the transportation industries-producers of a nonstorable service—

can be a calamity. So it is no surprise that, when in doubt, the court construes disputes as minor." *Brotherhood of Locomotive Eng'rs v. Atchison, T. & S.F. Ry.*, 768 F.2d at 920. Therefore, "[w]here the parties disagree as to whether the existing contract permits the carrier's actions, the dispute is minor unless the carrier's claims of contractual justification are 'frivolous' or 'obviously insubstantial.'" *Atchison, T. & S.F. Ry. v. United Transp. Union*, 734 F.2d at 321, quoting *Chicago and N.W. Transp. Co. v. United Transp. Union*, 656 F.2d at 279. "Such a test is necessary to protect the jurisdiction of the NRAB and to promote the purposes of the Railway Labor Act." *Atchison, T. & S.F. Ry. v. United Transp. Union*, 734 F.2d at 321 (citation omitted).

### III

#### a.

In our view, the district court's determination that this dispute is a minor dispute subject to the jurisdiction of the NRAB conforms to the foregoing test. As the district court observed, the contract provides for the payment of electricians on both hourly and monthly bases. Although the Union submits that the technical duties of the newly-posted hourly-rated station-lineman's position are identical to those of the monthly-rated lineman-electrician's position it replaced, the district court found that the two positions were significantly different because the new station-lineman's position did not require 24–hour-a-day duty or frequent overnight travel. The company's position that it can abolish one job permitted by the contract and replace it with another also permitted by the contract—when the duties assigned the incumbents in each are different—certainly is a matter of contract interpretation.

#### b.

The Union makes several arguments to the contrary that require comment.

#### 1. Past Practice

The Union submits that, in the past, CNW has always posted monthly-rated lineman-electrician positions whenever a lineman-electrician has left his job. Therefore, the Union argues, "[e]ven assuming the contract on its face permits what CNW says it does, the fact is that over time the parties have agreed to practices different from those specified in the contract." Appellant's Br. at 16. In response, CNW introduced evidence, in the form of an affidavit from its Vice-President for Labor Relations, indicating that it had replaced vacant monthly-rated electrician positions with hourly-rate positions on several occasions prior to the hourly posting at DeKalb. The Union argues that the affidavit contains inadmissible hearsay and should not have been allowed into evidence by the district court.[3] Without this evidence, submits the Union, the unbroken history of monthly re-postings renders CNW's construction of the collective bargaining agreement unreasonable.

We need not resolve the Union's evidentiary objections to the CNW affidavit. Even without the affidavit, the record would reflect only that, in the past, CNW had never actually switched an electrician's position from monthly to hourly. To demonstrate that a change in practice constitutes a change in the contract, the practice in question, must have "occurred for a sufficient period of time with the knowledge and acquiescence of the employees to become in reality a part of the actual working conditions." *Detroit & T. Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 154, 90 S.Ct. 294, 301, 24 L.Ed.2d 325 (1969).[4] Here, there is no affirmative indication in the record that CNW ever aban-

---

**3.** The district judge denied a motion to strike the affidavit, but did not specifically rely on it in issuing the injunction.

**4.** *See also Maine Cent. R.R. v. United Transp. Union*, 787 F.2d 780 (1st Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 169, 93 L.Ed.2d 107 (1986) (a

*railroad's* evidence of a *union's* acquiescence in a past extra-contractual practice resulted in characterization of a dispute as minor and consequent reversal of a *status quo* injunction entered in the union's favor).

doned its asserted right under the contract to post positions on either an hourly or monthly basis, even if it never exercised that right until now.

### 2. Prior Use of Major Dispute Procedures

■ The Union argues that CNW's earlier efforts to achieve a complete modification of the contractual pay rates for electricians through the major dispute provisions of section 6 of the Railway Labor Act, 45 U.S.C. § 156, demonstrate that CNW itself views the re-posting of the DeKalb position as part of an effort to modify the working conditions specified in the collective bargaining agreement. In response, CNW points out that it had expressed, throughout the negotiation process, its belief that it could, within the contract, unilaterally shift all electricians' positions from monthly to hourly pay rates.

Other courts of appeals, when confronted with the argument the Union makes here, have viewed it skeptically. *See Brotherhood of Ry. Carmen v. Norfolk & W. Ry.,* 745 F.2d 370, 376, n. 6 (1984); *St. Louis Sw. Ry. v. United Transp. Union,* 646 F.2d 230, 233–34 (5th Cir.1981).

> If one party has served a section 6 notice indicating a desire to change a collective bargaining agreement, it is still for the district court to determine whether the dispute in question is actually over a proposed change in rates of pay, rules or working conditions, and is therefore major. Courts will not rely on the labels parties place on their disputes or other "contentions" or "maneuvers" of the parties....

*Air Cargo Inc. v. Local Union 851,* 733 F.2d 241, 247 n. 6 (2d Cir.1984) (citations omitted). Like these courts, we are reluc-

tant to hold that CNW's earlier renegotiation efforts bar its claim that this issue is a minor dispute. In our view, CNW's attempt to achieve an overall realignment of the job structure through negotiation need not have been undertaken at the risk of abandonment of present contract rights.[5] Indeed, as the *Carmen* court pointed out, 745 F.2d at 376 n. 6, the duty of railroads and their employees to negotiate is extended by 45 U.S.C. § 152 Second to "all disputes," major or minor. We therefore reject the Union's assertion that CNW's prior treatment of this issue as a major dispute required the district court or this court to adopt the same characterization.

### Conclusion

Because we believe the district court properly determined that the dispute was "minor" and therefore within the jurisdiction of the NRAB, we affirm its judgment.

AFFIRMED.

---

**5.** Throughout this dispute, CNW has claimed that its desire to shift electrician positions from monthly to hourly pay rates is the result of increased use of modern microwave technology in its signal operations, necessitating less overnight and emergency repair and maintenance work. The Union claims that these technological changes were "in nowise contemplated by the drafters of the agreement in 1921," Appellants' Br. at 16, and that a new contract is therefore required. However, we conclude that the contract is at least arguably flexible enough

to allow the change. Even though it is undoubtedly true that the 1921 drafters did not specifically anticipate microwave technology, the contract contains no provisions requiring that CNW maintain specific manpower levels in any particular schedule or pay rate category. *Southern Ry. v. Brotherhood of Locomotive Firemen & Enginemen,* 337 F.2d 127 (D.C.Cir.1964) is therefore distinguishable because it involved the elimination of fireman positions where the contract specifically required the posting of a fireman in each locomotive.