**BROTHERHOOD RAILWAY CARMEN DIVISION, TRANSPORTATION COMMUNICATIONS INTERNATIONAL UNION, Plaintiff,**

v.

**GREEN BAY AND WESTERN RAILROAD CO., Defendant.**

No. 92–C–0825.

United States District Court, E.D. Wisconsin.

Sept. 3, 1992.

Stephen M. Olson, Priscilla L. Hapner, Kirkpatrick & Lockhart, Pittsburgh, Pa., and Christine Cowles, Borgelt, Powell, Peterson & Frauen, S.C., Milwaukee, Wis., for defendant.

John A. Edmond, Nora Carroll, Guerrieri, Edmond & James, Washington, D.C., and Scott D. Soldon, Naomi E. Eisman, Previant, Goldberg, Uelmen, Gratz, Miller &

Brueggeman, Milwaukee, Wis., for plaintiff.

## DECISION AND ORDER

WARREN, Senior District Judge.

The plaintiff, Brotherhood Railway Carmen Division ("BRC"), is a division of the Transportation Communications International Union ("TCU") which represents carmen in the railroad industry, and is the duly authorized collective bargaining agent for thirteen carmen employed by the defendant, Green Bay & Western Railroad Company ("Green Bay"). Complaint at ¶ 5. Green Bay is in the process of transferring its operations to the Wisconsin Central Transportation Company and expects to consummate the sale if the Interstate Commerce Commission approves of the sale; the ICC's decision is expected to be issued on December 10, 1992. Because Green Bay fired the local chairman of its union, Kenneth Simons, the union claims that its members will not be adequately represented when negotiating for benefits accompanying the transfer. Before the Court is the plaintiff's motion for a preliminary injunction ordering the reinstatement of Mr. Simons or, in the alternative, an order compelling the defendant to submit to expedited arbitration. For the following reasons, the Court finds that it has jurisdiction to order an expedited arbitration and will therefore do so; however, because it does not have jurisdiction to reinstate Mr. Simons, it must deny the plaintiff's motion in that respect.

## I. BACKGROUND

Kenneth Simons began working for Green Bay as a carman in 1974. In 1977, he was elected Financial Secretary of Lodge 6779 of BRC and has been active in the union ever since. As of June 1992, he served as Local Chairman of the Lodge while he continued to work as a carman for Green Bay. His duties as Chairman included policing Green Bay's compliance with BRC's collective bargaining agreement, representing union members who had been disciplined by Green Bay, and assisting as the liaison between the union members and Dennis Dilley, the General Chairman of the Milwaukee Joint Protective Board.

At the present time, there are thirteen members of Local 6779, including Mr. Simons. Mr. Simons and another employee work in Wisconsin Rapids, Wisconsin. The remaining union members work in Green Bay, Wisconsin. When one of the Wisconsin Rapids carmen wishes to take a scheduled leave of absence, Green Bay Railroad must arrange to have a replacement come over from Green Bay, Wisconsin to cover for the missing employee.

Under the terms of the collective bargaining agreement between Green Bay and BRC, Mr. Simons was permitted to take occasional days off from his employment, without pay, to conduct union business. In the past, he took time off to attend BRC conventions, testify at hearings, and otherwise represent Lodge 6779's interests as its chairman. When a Green bay employee wished to take the day off to attend a union function, it was customary for that employee or another union member to notify the company orally the day before or the day of the intended absence. Mr. Simons always complied with this custom and, prior to May 19, 1992, had never had any difficulties with Green Bay's management in this respect.

On May 19, 1992, Mr. Simons left a note on his supervisor's desk, informing him that he would be taking two days off for union business on May 22 and 23.[1] The supervisor, John Milquet, did not see the note until late in the afternoon of May 20, 1992. According to Mr. Milquet, when a carman asked for the day off, a replacement would have to fill in. Both of the two possible replacements were already covering for other carmen, since it was Memorial Day weekend and others had also requested those days off. It would have been impossible to find a replacement for Mr. Simons, and Mr. Milquet told him that he

---

1. In the same note, Mr. Simons also requested time off for three days in early June. Green Bay had no problems with this request and granted it; defense counsel has argued that this vitiates the plaintiff's argument of unlawful discharge.

could not take those two days off. Mr. Simons then asked if he could report for work two hours late on May 22, since he would be attending a meeting in Independence, Wisconsin, and could rush back for the remainder of his shift if necessary. Mr. Milquet informed him that this was not an option. Mr. Simons went to the union meeting in Independence on May 22 and did not report to work at all. On May 23, he stayed home from work to catch up on union paperwork.

Pursuant to the collective bargaining agreement, Green Bay held an investigatory hearing on June 25, 1992, at which time Mr. Simons explained that he was absent from work on May 22 and 23 due to union activities. Nevertheless, he was discharged by Green Bay on June 29, 1992. He contends that such discharge was based upon his union activities and the fact that he was outspoken against the impending transfer to the Wisconsin Central Transportation Company. BRC claims that Green Bay's disciplinary proceedings and subsequent termination of Mr. Simons was a flagrant violation of Rule 23 of the collective bargaining agreement, which prohibits discrimination against union employees and provides those employees leaves of absence when on union business. However, Green Bay insists that Mr. Simons' union affiliation had nothing to do with the discharge, which was brought on solely by Mr. Simons' lack of respect for authority and failure to obey direct orders from management.

On July 16, 1992, Mr. Dilley appealed Mr. Simons' termination to John Switzer, Green Bay's Manager of Labor Relations. The appeal stated that Green Bay had violated Rule 23, contended that the transcript of the June 25 proceedings was incomplete, and requested that Mr. Simons be either reinstated immediately and compensated for lost pay or that Green Bay submit to an expedited arbitration process. Roger Leary, Green Bay's superintendent who had presided at the hearing, responded and categorically denied that Green Bay had altered the transcript and refused to reinstate Mr. Simons. Mr. Leary did not address the portion of the appeal relating to

the expedited arbitration. When Mr. Dilley telephoned Mr. Switzer to inquire about reinstatement, he was told that Mr. Simons would not be reinstated and that expedited arbitration would not be considered until the grievance procedures outlined in the BRC/Green Bay agreement had been exhausted. Green Bay has sixty days under the agreement to consider Mr. Dilley's appeal, and Mr. Dilley has estimated that the final conference of the grievance will not occur until after August 29, 1992.

Once Green Bay's internal grievance procedure is exhausted, if BRC is still unsatisfied with the outcome of the dispute, it may institute arbitration proceedings before the National Railroad Arbitration Board ("NRAB") within nine months of Green Bay's denial of the appeal. However, the arbitration process is slow and would not result in a decision being made before the sale of Green Bay. BRC's counsel informed the Court at oral argument that with a private arbitrator and an expedited arbitration, the parties could expect binding results within one month, well before the sale.

Without reinstating Mr. Simons, or at least ordering expedited arbitration, the plaintiff claims that its members will suffer irreparable harm. Green Bay's successor will most likely refuse to assume the collective bargaining agreement that the union negotiated with Green Bay. Wisconsin Central intends to lay off Green Bay employees, some of which may be members of Local 6779. Additionally, many union members will have to renegotiate their job benefits and may have to concede certain benefits in order to keep their jobs. Being deprived of on-the-spot union representation by the man who has represented them in years past will result in permanent harm to the union members.

Green Bay strenuously opposes both types of relief. Mr. Simons has had a checkered past with Green Bay, and his insubordination on May 22 and 23 was the proverbial straw that broke the camel's back. Green Bay contends that Mr. Simons violated company policy and that termination was an appropriate form of sanc-

tion. Furthermore, BRC would not suffer any undue harm from Mr. Simons' absence from the premises. First, his predecessor as chairman is still employed at Green Bay and has the familiarity with the collective bargaining process necessary to adequately represent the union members, if need be. Second, the true union representative is Dennis Dilley; Ken Simons was just a Green Bay employee who held the unpaid title of Local Chairman. In any case, forcing Green Bay to reinstate an employee who has been terminated based upon his poor performance and attitude within the company would be contrary to the well-settled labor law policy of "obey first, grieve later." If arbitration vindicates Mr. Simons, he will be awarded back pay and reinstatement. Therefore, an injunction would be inappropriate.

Similarly, Green Bay opposes expedited arbitration based upon the fact that it entered into its collective bargaining agreement with the intent to be bound by its terms. If the Court ordered expedited arbitration, Green Bay would not receive its benefit of the bargain with the union, as it would be subject to a provision that was unilaterally submitted without any negotiation at all.

BRC filed its complaint in this Court on August 6, 1992. The parties agreed to an expedited briefing schedule, and motions for and against the injunction were submitted to this Court within two weeks. Oral argument was conducted in the morning of August 18, 1992.

## II. LEGAL FRAMEWORK

### A. *Jurisdiction to Enjoin Under the RLA*

As a threshold issue, the Court must determine whether it has jurisdiction to afford the plaintiff the relief requested. Although Congress has determined that the dynamics between labor and management are best left alone by the judiciary, there are circumstances under which judicial intervention is warranted. Therefore, while courts may not have jurisdiction over arbitrable disputes, they may be permitted to adjudicate matters under extraordinary circumstances.

The Railway Labor Act ("RLA") classifies labor/management disputes as "minor disputes" and "major disputes." This distinction is crucial in the jurisdictional context, since the dispute resolution procedures followed by the parties are determined by the type of dispute. *Railway Labor Executives Association v. Norfolk & Western Railway Co.*, 833 F.2d 700, 703–04 (7th Cir.1987). Both Green Bay and BRC have acknowledged that this is a "minor dispute." "Minor" does not necessarily mean "less important" or "less costly," as it might be conventionally interpreted. Rather, other courts have defined minor disputes as focusing on changing or interpreting an existing collective bargaining agreement. *Brotherhood of Railroad Signalmen v. Burlington Northern Railroad Co.*, 829 F.2d 617, 619 (7th Cir.1987); *Chicago & North Western Transportation Co. v. International Brotherhood of Electrical Workers, Local Union No. 214*, 829 F.2d 1424, 1427 (7th Cir.1987).

When a dispute is minor, a defined procedure must be followed. "[T]he parties first must attempt to resolve their dispute through negotiation. If negotiation fails, however, the parties must submit their minor dispute to the National Railway Adjustment Board for resolution. The NRAB's jurisdiction over minor disputes is exclusive." *Norfolk & Western*, 833 F.2d at 704. Notwithstanding the NRAB's exclusive jurisdiction, district courts do have the power to enjoin the conduct of the parties under certain circumstances.

For example, it is well settled that a district court may enjoin a strike in a minor dispute. While a union generally enjoys an unfettered right to strike in major disputes, strikes in minor disputes are prohibited under the RLA. Because a district court has the jurisdiction to issue an injunction when a specific statutory provisions of the RLA has been violated, the Supreme Court has held that a court may enjoin a strike. *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co.*, 353 U.S. 30, 33–34, 77 S.Ct.

635, 636–637, 1 L.Ed.2d 622 (1957); *see also Pittsburgh & Lake Erie Railroad Co. v. Railway Executives*, 491 U.S. 490, 513, 109 S.Ct. 2584, 2598, 105 L.Ed.2d 415 (1989) (district court has power to compel compliance with RLA). In order to persuade management to submit to arbitration for minor disputes under the RLA, the unions had to relinquish their powers to strike as a *quid pro quo*. Arbitration would never be an effective means of dispute resolution if the union could strike at any time. Therefore, permitting a court to issue an injunction would serve the ends of the RLA; rather than usurping the role of arbitration, an injunction would render arbitration more effective. *See Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976) (discussing NLRA as opposed to RLA); *see also Locomotive Engineers v. M–K–T Railroad Co.*, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379 (1960) (court's exercise of equitable jurisdiction preserves, rather than encroaches upon, Board's jurisdiction).[2]

■ Over time, the Norris–LaGuardia's prohibition on federal court inference with non-violent strikes has been curtailed by courts and subsequent legislation. Under the RLA, it is settled that federal courts have the jurisdiction to grant equitable relief in extraordinary circumstances. Under the National Labor Relations Act, district courts are afforded the same jurisdiction. However, the extent of this jurisdiction is unclear, especially in light of the language used by the Supreme Court in *Buffalo Forge*, which suggests somewhat broad jurisdiction under equitable considerations.

The Seventh Circuit extended the jurisdiction of district courts under the NLRA in *Local Lodge No. 1266 v. Panoramic Corp.*, 668 F.2d 276 (1981), adopting the Fourth Circuit's "frustration of arbitration" exception to the jurisdictional limitations of the Act and clarifying the scope of *Buffalo Forge*. In *Panoramic*, the district court enjoined the sale of a company pending arbitration. Had the injunction not been issued, the sale would have been completed before the company's employees ever had an opportunity to engage in substantial meaningful collective bargaining. The Seventh Circuit affirmed, holding:

> Such [equitable] relief is available, in aid of arbitration, where the underlying dispute is subject to mandatory arbitration under the labor contract and where an injunction is necessary to prevent arbitration from being rendered a meaningless ritual. As in all *Boys Markets [Inc. v. Retail Clerks Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970)] situations, the court must be satisfied that traditional requirements of equity ... support the award of injunctive relief. When these preconditions have been satisfied, we believe that a status quo injunction serves the salutary purpose of enforcing the parties' agreement to arbitrate by preserving an effective arbitral remedy for bargaining agreement breaches.

*Id.* at 283.

It is unclear whether this holding would apply to injunctions under the RLA as well. The Seventh Circuit commented on the existence of the "frustration of arbitration" exception in an RLA action, referring not to *Panoramic* but to the Supreme Court's language in *M–K–T*, which supports this type of exception. *Brotherhood of Railway v. Atchison, Topeka and Santa Fe Railway Company*, 847 F.2d 403, 405 n. 1 (7th Cir.1988). In a case where the arbitrator's findings might be issued too late to

---

2. It is important to distinguish the facts of *M–K–T* from those in the present case. In *M–K–T*, the Supreme Court recognized that a district court which had the power to enjoin a union striking over a minor dispute also had the power to attach conditions to the injunction to preserve the *status quo* pending arbitration. The Supreme Court left open the issue of whether a union could bring an independent action seeking to enjoin management from continuing with its disputed conduct pending arbitration. This Court recognizes those distinctions and realizes that a district court's jurisdiction to enjoin an illegal strike is much more clearly defined than its jurisdiction to issue other injunctions. However, the Supreme Court's language supporting its decision, which is consistent with other language in the Seventh Circuit suggesting a "frustration of arbitration" exception, convinces this Court that it has jurisdiction to order the type of equitable relief imposed today.

afford the union any type of substantial relief, "the action of the district judge, rather than defeating the Board's jurisdiction, would operate to preserve that jurisdiction by preventing injury so irreparable that a decision of the Board in the unions' favor would be but an empty victory." *M–K–T,* 363 U.S. at 534, 80 S.Ct. at 1330. "This sort of injunction does not amount to a decision on the merits and does not interfere with the NRAB's consideration of the matter." *Santa Fe,* 847 F.2d at 405 n. 1. However, in *Santa Fe,* there was no conclusive finding as to whether injunctive relief was available, since the plaintiffs were seeking relief on the merits rather than a preliminary injunction.

### B. PRELIMINARY INJUNCTIONS

 Once a court has determined that it has jurisdiction to grant injunctive relief, it must then make an inquiry into whether the conditions warranting such relief are present. To be entitled to an injunction, the moving party must show that its dispute is arbitrable, that it has a likelihood of success on the merits, that it would suffer irreparable injury without an injunction, that it has no adequate legal remedy, and that it would suffer more without an injunction than the non-moving party would if an injunction were imposed. *See Panoramic,* 668 F.2d at 283–89.

 When a union seeks a preliminary injunction pending arbitration, the ordinarily stringent requirements accompanying the "likelihood of success" element are relaxed somewhat. Instead of showing a likelihood of success on the merits of the underlying claim, the union must merely "establish that the position [it] will espouse in arbitration is sufficiently sound to prevent the arbitration from being a futile endeavor." *Id.* at 284–85, quoting *Transit Union Division 1384 v. Greyhound Lines, Inc.,* 529 F.2d 1073, 1077–78 (9th Cir.1976). A court is limited in its factual inquiry by the NRAB's exclusive jurisdiction over the substance of the dispute itself. *National Railway Labor Conference v. International Association of Machinists,* 830 F.2d 741, 749 (7th Cir.1987), and the Seventh

Circuit has noted that holding the union to a higher burden of persuasion before the district court would significantly infringe upon the arbitrator's jurisdiction. *Panoramic,* 668 F.2d at 284.

"Where ... an employer action threatens a permanent loss of jobs, a damage remedy is inadequate." *Panoramic,* 668 F.2d at 286. Reinstatement is the traditional remedy for discharges that violate the bargaining agreement. When the possibility of reinstatement no longer exists, there are generally no money damages available which are not speculative or inadequate. *See M–K–T,* 363 U.S. at 534, 80 S.Ct. at 1330 (impossible to make employees whole when dispute involves "discharge of employees from positions long held").

### III. ANALYSIS

 As an initial matter, the Court finds that jurisdiction exists for it to hear this dispute. Under the Seventh Circuit's "frustration of arbitration" doctrine, which is bolstered by persuasive language from *M–K–T* explaining why jurisdiction is normally prohibited, the Court is convinced that the only manner in which arbitration could have any effect at all on this dispute is if it occurs before the anticipated date of sale, December 10. 1992. The defendant's protestations do not sway the Court.

 First, Green Bay attempts to downplay *Panoramic*'s relevance to the case at hand by distinguishing it as being under the NLRA, whereas this case falls under the RLA. Plaintiffs have rebutted, and this Court agrees, that although the NLRA and the RLA are two discrete statutory schemes, the subject of a district court's jurisdiction to grant injunctive relief is treated similarly under both. Green Bay's citation to *Chicago and North Western, supra,* as refuting the holding in *Panoramic* with respect to RLA cases is confusing. In *Chicago and North Western,* the Seventh Circuit upheld the district court's determination that it could not enjoin the sale of a railroad because it did not have jurisdiction. However, the union never argued frustration of arbitration on appeal, and there is no evidence that this

exception was brought out in district court either. *Id.*, 855 F.2d at 1287. Furthermore, the Seventh Circuit noted that the union "failed to show that a prohibition of the Duck Creek South line sale is necessary in order to preserve the NRAB's jurisdiction." *Id.* at 1288. This case does not appear to undercut *Panoramic*'s authority in the least.

In addition, this Court's jurisdiction over this matter will not compromise the NRAB's jurisdiction. Both BRC and Green Bay agreed to submit to arbitration in their collective bargaining agreement. The Court intends to grant BRC interim relief only, with as minimal a discussion of the merits of the case as is possible. The only effect of the Court's order will be upon the timing of the proposed arbitration, which will occur earlier than provided for in the agreement. The dispute over Mr. Simons' termination will be resolved by an arbitrator, as the RLA requires. The Court will not usurp that jurisdiction at all and will act only to ensure that arbitration is not an exercise in futility.

Green Bay has pointed out that most of the events anticipated by the union are contingent upon certain other events occurring and therefore, the perceived harm is not as imminent as it would be if the future was certain. This may be so, but BRC has averred that the probability of the sale going through and of Wisconsin Central refusing to negotiate with the union are extraordinarily high, and Green Bay has not disputed this fact. When balancing the high probability of the need for expedited arbitration and the anticipated damages of denying such arbitration, the Court concludes that the harm is great enough imminent enough to justify this order.

The union has satisfied all of the elements necessary for this Court to afford it an expedited hearing. It has shown that there is an arbitrable dispute and that its members have no adequate remedy at law. In addition, the union has convincingly argued that it will suffer more hardship from being deprived of effective arbitration than Green Bay will from being subject to expedited arbitration. During oral argument, Green Bay's counsel finessed the "balance of hardships" issue. When confronted directly with the question later, he could not point to any actual prejudice which would accrue to Green Bay from expedited arbitration, but merely asserted that Green Bay entered into an agreement with the union which specified a time period for arbitration and should be bound by that. The Court finds that Green Bay would not be prejudiced by an expedited arbitration. Indeed, counsel assured the Court that Green Bay intends to respond to Mr. Simons' appeal before the sixty-day deadline expires on August 29, 1992, and was in the process of drafting a written decision at the time of oral argument. Therefore, a consideration of the elements necessary for a preliminary injunction reveals that BRC is entitled to an expedited arbitration.

■ However, the Court's jurisdiction over this matter only extends far enough to order the parties to submit to expedited arbitration. Whether or not Mr. Simons was terminated as a result of his union activities or because he was a bad employee is something which must be decided by an arbitrator, pursuant to the bargaining agreement. This Court has no authority to issue this type of injunction, which would involve making the union and Mr. Simons whole before the grievance process was complete. This would not render arbitration any more effective and would in essence be a decision on the merits of the case. "Injunctive relief pending arbitration of a minor dispute does not maintain the status quo because the status quo of labor relations is that which allow the grievance to be litigated *after* action by the employee." *International Association of Machinists v. Eastern Air Lines*, 826 F.2d 1141, 1148 (1st Cir.1987). Finally, Green Bay seems to have a strong legitimate reason for terminating Mr. Simons. This Court feels that ordering a private organization to reinstate a terminated employee prior to a finding of wrongful discharge would be inappropriate in this context, whether or not it has jurisdiction to do so. Therefore, the plaintiff's motion for reinstatement pending arbitration will be denied.

## IV. CONCLUSION

In conclusion, the Court having found that it has jurisdiction to order both parties to submit to an expedited arbitration, hereby ORDERS both parties to submit to such arbitration, the costs of which shall be divided equally by the two parties.

SO ORDERED.